FRED W. JONES, Jr., Judge.
The defendant, Anthony McCarty, was originally tried for second degree murder (R.S. 14:30.1) and armed robbery (R.S. 14:64). Since the jury was unable to reach a verdict, the result was a mistrial. A second jury trial followed and defendant was found guilty of both charges.
The defendant filed a motion for a new trial on the ground of prosecutorial misconduct. After the holding of two hearings, the motion was denied. A motion for a post-verdict judgment of acquittal was also rejected. On the second degree murder conviction the defendant was sentenced to life imprisonment and on the armed robbery conviction to a concurrent prison sentence of 55 years at hard labor, both without benefit of parole.
Defendant appealed his convictions, asking for reversal on the ground of prosecu-torial misconduct and insufficient evidence to support the convictions.

*789
Factual Context

Just before midnight on January 12, 1981, an armed robbery took place at the Town House Apartments in downtown Shreveport. During the robbery, in which some $8.00 was taken from the cash drawer of the apartments, the night clerk Burt was shot in the head. He subsequently died from the wound.
According to Bullard, owner and operator of a club known as the Cimarron Strip, located a couple of blocks from the Town House Apartments, McCarty entered the lounge around midnight on the night of the shooting and stated that he had just shot a man at the described apartments. Bullard said that after the police came into the club looking for someone with blood on his clothes, the defendant gave him a .32 caliber revolver to keep for him. McCarty allegedly left the bar at about 12:30 o’clock A.M., was gone about 30 minutes, and then returned. Bullard stated that defendant handed a baseball cap to Ruth Ann Washington, another bartender at the lounge. He said that the defendant left the club again around 2:00 o’clock A.M. with two black females. Bullard asserted that, before leaving, McCarty retrieved both his revolver and the baseball cap.
The record reflects that law enforcement officials visited the Cimarron Strip three times that night in connection with their investigation. However, Bullard, reportedly a police informant, did not transmit his information concerning McCarty’s involvement with the Town House Apartments incident until the following morning. He then identified the defendant from a photographic lineup. Bullard also indicated that Bennett Thomas and Preston Gantt were present when McCarty asserted that he had killed a person.
Acting on the information received from Bullard, the police located McCarty at a grocery store and arrested him. They seized a revolver from the inside of his coat. A laboratory analysis revealed that the bullet which killed Burt came from this weapon.
McCarty gave the police an oral statement to the effect that on the morning before the shooting he tried to break up a fight, during which incident someone grabbed his gun and fired it three times. He retrieved the pistol and left for the Congo Club. After purchasing a half pint of gin, McCarty stated that he went to a house near Cush’s Grocery at about 8:30 o’clock P.M. and drank until he passed out.
A grand jury indicted McCarty for the crimes involved in the Town House Apartments incident and the trials in question followed. Bullard testified generally as outlined above.
Azzie O’Neal, who testified at the second trial but not at the first, corroborated the testimony of Bullard, particularly with reference to McCarty coming into the lounge on the night of the shooting, stating that he had just shot a man at the Town House Apartments, and asking Bullard to keep his revolver. According to the record, Ms. O’Neal was a friend of Bullard who occasionally assisted him at the lounge.
Bennett Thomas testified that he was employed at the Cimarron Strip as a disc jockey on the night of the shooting. He said that the lounge was rather crowded and the music was so loud that it was difficult to hear a person talking. Thomas denied hearing McCarty admit to having just shot someone and did not see the defendant hand his weapon to Bullard. Thomas admitted that he was a friend of the defendant.
Ruth Ann Washington denied that the defendant had given her a baseball cap to hold for him on the night of the shooting.
Cammie Ray Bell testified that on the night of the shooting a person known to him as “Little Ronnie” came into the Ci-marron Strip and asked Bell if he had seen “Bo Peep.” Bell said that he directed the inquirer to the back room of the club where a dice game was in progress. According to Bell, “Little Ronnie” approached the defendant and, after a brief conversation, McCarty handed him a pistol. Bell said that this incident occurred around 10:30 o’clock P.M. on the night of the Town *790 House Apartments incident. After securing the weapon, “Little Ronnie” left the lounge.
During his cross-examination by the prosecution, Bell admitted to having been in the parish jail the day before he testified but denied being in the same cell with the defendant. He subsequently recanted [after impeachment] and conceded that the jailer had placed him in the same cell with the defendant just before he was scheduled to testify.
Mona Eilee, whose sister had given birth to defendant’s child, testified that defendant and Bullard were gambling at the Ci-marron Strip on the night of the shooting. She stated that “Little Ronnie” came in after midnight and handed the defendant a pistol. This witness, who did not give her story to the police until a year after the incident, asserted that McCarty gave a bartender a hundred dollar bill [which he had won from Bullard] and told him to “treat the house.”
Finally, the defendant took the stand and testified substantially the same as Bell and Ms. Eilee, particularly with reference to “Little Ronnie” borrowing his revolver. He said that when the weapon was returned, Bullard suggested that it be kept behind the bar. The defendant explained that he had gone to the club early in the evening but left when Bullard confronted him about a problem with the sale of some diamond rings. McCarty said that he returned to the lounge later that evening to socialize with some women. He added that he departed the club around closing time and proceeded to a house located near Cush's Grocery where he drank until he passed out. McCarty denied material aspects of his initial statements to the police.
The actions of the jury and the trial judge have been described.

Claim of Prosecutorial Misconduct

Subsequent to the conclusion of defendant’s second trial, defense counsel moved for a new trial after allegedly learning that the prosecutor had deliberately caused the defense witness, Bell, and the defendant to be placed in the same jail cell just prior to the time for Bell to testify at the trial.
At the hearing on the motion for a new trial, Brenda Manners, the jailer, testified that the prosecutor telephoned her and asked if Bell and the defendant could be placed together in the same jail cell as soon as possible. The jailer said that she complied with this request, in accordance with department policy.
The secretary of one of the Caddo Parish District Judges testified that the prosecutor told her that he “had the Deputy put Cammie Ray Bell and McCarty in the same cell block because (he) knew they would impeach themselves.”
The prosecutor testified that, on the spur of the moment, he told the jailer that he would have “no objection if she wished to place the two together in the same cell....”
In denying the motion for a new trial, the trial judge concluded that the prosecutor was guilty of an error in judgment, but not of prosecutorial misconduct. Furthermore, he categorized the error as harmless because the jury had the testimony of Mona Eilee, which was similar to that of Bell.
For the reasons hereinafter explained, we do not agree with the trial judge.
Addressing a prosecutor’s duty, the court in Berger v. U.S., 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) pointed out:
The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor— indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods *791 calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
The following passage, amplifying upon that duty, is found in 63 Am.Jur.2d, Prosecuting Attorneys, Sec. 27 (1972):
To the state the prosecuting attorney owes honesty and fervor in the performance of his official obligations as a prosecutor; his duty to the defendant is fairness. The public interests demand that a prosecution be conducted with energy and skill, but the prosecuting officer should see that no unfair advantage is taken of the accused. It is as much his duty to see that a person on trial is not deprived of any of his statutory or constitutional rights as it is to prosecute him for the crime with which he may be charged. Nonetheless, zeal in the prosecution of criminal cases is to be commended and not condemned. If convinced of the defendant’s guilt, the prosecuting attorney should, in an honorable way, use every power that he has to secure the defendant’s conviction. At the same time, it is his duty to hold himself under proper restraint and avoid violent partisanship, partiality, and misconduct which may tend to deprive the defendant of the fair trial to which he is entitled, and it is as much his duty to refrain from improper methods calculated to bring about a wrongful conviction as it is to use every legitimate means to bring about a just one.
The prosecutor in this case was guilty of misconduct because:
(1) The testimony of the witness, Bell, was important. It was offered in an effort to show that the defendant did not commit the crimes with which he was charged. If believed by the jury, the defendant would have been acquitted.
(2) Assessment of a witness’ credibility is a critical function of the jury which should not be subverted by the prosecutor’s manipulation of the jail system in such a manner as to destroy that credibility. Even if this witness had from the beginning acknowledged being in the same jail cell with the defendant, the jury would likely have suspected that they discussed the case.
(3)Not to be ignored is the fact that, by having a witness and the defendant placed in the same jail cell, the prosecutor assisted them in violating the rule of sequestration, which is designed to prevent the tainting of testimony.
Was the error harmless beyond a doubt because another witness repeated the same story? We cannot say, since it is impossible to discern what weight the jury assigned to this impeachment of Bell. It is possible that the jury refused to believe Ms. Eilee and the defendant.because of the impeachment.
In summary, the zeal of a young prosecutor to convict is understandable when he is certain of the defendant’s guilt. On the other hand, every defendant, regardless of the blemishes on his character and the opprobrium of his alleged crime, is entitled to a fair trial. When the prosecutor’s fervor ignores that constraint, it is inexcusable.
Finding prosecutorial misconduct which so prejudiced the defendant that his convictions must be reversed, we pretermit consideration of the complaint of insufficient evidence. Obviously, we cannot intelligently consider this in the light of our holding that the jury’s assessment of part of this evidence was not subject to a fair weighing because of the described prosecutorial misconduct.
For the reasons set forth, we reverse defendant’s convictions, vacate his sentences, and remand the case to the trial court for a new trial, consistent with this opinion.